## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 23CR0354-TJK** |
| | ) | |
| | ) | |
| **JERRY DANIEL BRAUN,** | ) | |
| | ) | |
| | ) | |
| **Defendant,** | ) | |

—————————————————

## MOTION TO DISMISS INDICTMENT FOR SELECTIVE ENFORCEMENT IN VIOLATION OF THE FIRST AMENDMENT

The Defendant, **JERRY DANIEL BRAUN** through undersigned counsel, moves to dismiss the Indictment on the basis that the United States is selectively enforcing the civil disorder, and other criminal statutes with which he is charged on the basis of political views in violation of the First Amendment.

### Introduction

In the 20 years since 18 U.S.C. § § 1512(c)(2) was enacted, hundreds of persons, who have espoused progressive political views have disrupted Congressional hearings being held in the United States Capitol yet not a single one of those persons has been charged with this 20-year felony. Similarly, during 2020 and at other times, in the District of Columbia "peaceful demonstrations coincided with incidents of rioting,

1

vandalism, looting, and arson" by persons demonstrating against excessive use of police force and other issues of racial justice. These demonstrations caused the Mayor to impose curfews, which affected interstate commerce. *See, e.g., Tinius v. Choi,* No. 22-7047, 2023 WL 4378742, at *1–2 (D.C. Cir. July 7, 2023).[1] None of these persons were charged with felony civil disorder charges under 18 U.S.C. § 231(a)(3). Supreme Court arguments have also been intentionally disrupted, yet those persons have also not been charged with this felony offense. While prosecutors are allowed substantial discretion, the selective and disparate prosecution and enforcement of federal criminal laws apparent in Braun's case is prohibited by the First Amendment. Such disparate treatment amounts to selective prosecution and enforcement on the basis of the content of Braun's speech in violation of his First Amendment rights that requires this Court to dismiss the charges against him and, at a minimum, require the Court to compel specific discovery regarding disparities in charging decisions.

In support of his claims, Braun states the following:

## I.    Factual Background

Counts One of the Indictment charges Braun with Civil Disorder in violation of 18 U.S.C. § 231(a)(3). He is also charged with several misdemeanor offenses, including offenses which prohibit certain disruptive conduct within the Capitol and its grounds in violation of  18 U.S.C 1752 and 40 U.S.C. §§5104(e)(2)(D) (Counts Seven and Nine).

The charges arise out of the protests at and around the Capitol of the United States after a political rally at which former President Trump and other prominent Republicans spoke on January 6, 2021, the day that Congress was scheduled to count the Electoral College vote. On that day, tens of thousands of people attended a political rally held at the Ellipse.  At the rally, Trump and other prominent Republicans gave speeches alleging voter fraud during the 2020 election. Among other things, during his speech, President Trump exhorted those in attendance at the rally to march to the Capitol to make their voices heard.[2]

The Indictment does not allege that Braun damaged or destroyed any property.  Nor does it allege that he injured any law enforcement officer or other person.  The government has filed both felony and misdemeanor charges against more than 1,500 persons who were present inside the Capitol or on its grounds on January 6.  Nearly a third of those charged, have been charged with the § 1512(c)(2) felony obstruction offense which the Supreme Court later determined to be prosecutorial overreach in January 6 cases.[3]

## II.    Similarly Situated Protesters Have Not Been Charged With Felony Civil Disorder Charges

From 2016, if not earlier, through the Summer and Fall of 2020, anarchists, left-wing rioters, and violent arsonists and street thugs played out a civil war of violence on America's city streets, particularly in our nation's capital.  They were often explicitly called to obstruct an official proceeding and engage in civil disorder in violation of 18 U.S.C. 231(a)(3), including attempting to disrupt the inauguration of President-Elect Donald Trump:





Public records and reporting reflects that thousands of protesters "overwhelmingly

supporting progressive causes" have been arrested by Capitol Police officers since

2016. *See* Mother Jones Magazine (1/8/21), *35 Times Capitol Police Arrested More*

*Demonstrators than the 14 Insurgents Arrested Wednesday* at 2 at

https://tinyurl.com/343eydt3.

---

[2]  https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification:

President Trump spoke at a rally in Washington, D.C., held to protest the
results of the Electoral College, which Congress was set to count later that
day. "We will never give up. We will never concede," he declared.
President Trump repeated his unsubstantiated claims of fraud in both the
November election and the Georgia U.S. Senate runoff election held the
previous night. He railed against Republicans he deemed insufficiently
supportive of his efforts to overturn the results and promised to "primary
the hell out of the ones that don't fight." The president also continued to
publicly pressure his vice president, Mike Pence, to reject electoral votes
in states that he lost. As the speech was concluding, Vice President Pence
issued a statement saying he lacked the constitutional authority to dismiss
the votes when Congress met later that day.

[3]  DOJ website at https://www.justice.gov/usao-dc/15-months-jan-6-attack-capitol

The Capitol Police's mass arrests of demonstrators overwhelmingly impacted people supporting progressive causes. Over eight days in 2016, Capitol Police arrested about 1,240 people protesting the influence of money in politics and Congress' failure to do anything about it. In July 2017, they arrested nearly 400 people fighting Republicans' attempt to repeal the Affordable Care Act. In September 2018, officers arrested another roughly 400 people who were protesting Brett Kavanaugh's nomination to the Supreme Court.

*Id.* at 2. None of those persons have been charged with a § 231 offense.

### A.    Confirmation of Justice Kavanaugh

In the fall of 2018, during the Senate confirmation hearings of Justice Kavanaugh, hundreds of persons protested on the Capitol grounds and steps, inside Senate Office buildings and in the Senate Hearing room while the Confirmation Hearings were taking place. None of the hundreds of protesters escorted out of the Senate Hearing Room by Capitol Police for disruptive behavior, while Senators waited for the disruptions to cease, were charged with the § 1512(c)(2) felony.[4] The Kavanaugh protests were organized by a coalition of progressive national advocacy groups, whose leaders publicly announced that they intended to disrupt the hearings to pressure and influence the Congress. At least one such prominent national leader, Linda Sarsour,

7

was herself arrested inside the Senate hearing room as she shouted out objections.  She

is also quoted as saying that she would "assist demonstrators who are fined or

arrested with legal and financial support." *See, e.g, The*

---

[4] *See* C-Span videos:

https://www.c-span.org/video/?452638-1/protests-judge-kavanaugh-sights-sounds;

https://www.c-span.org/video/?452638-2/protesters-voice-opposition-judge-
brett- kavanaugh-capitol-steps;

https://www.c-span.org/video/?c4746944/brett-kavanaugh-confirmation-hearing-
begins-pr otests

*Resistance at the Kavanaugh Hearings: More than 200 Arrests*, National Public Radio ("NPR"), September 8, 2018.[5]

There is no record on this Court's electronic case filing system that Ms. Sarsour was charged with any federal misdemeanor or felony as a result of her conduct that day.

It took less than two minutes for the first protester to be ejected from Supreme Court nominee Judge Brett Kavanaugh's opening day of testimony before the Senate Judiciary Committee. Seconds later, a second demonstrator was thrown out of the hearing room, followed by another, followed by another.

"This is a mockery and a travesty of justice," yelled one protester this week.              "Kavanaugh can't be trusted," shouted another.              Some protesters wore shirts that read things like "I am what's at stake." Others arrived on Capitol Hill dressed as characters from the *Handmaid's Tale*, the story of a dystopian future in which women are treated as property of the state.

At least 227 demonstrators were arrested between the start of the nomination hearings on Tuesday and the end of the testimony on Friday, according to the U.S. Capitol Police. Most of those charged this week with disorderly conduct, crowding or obstructing paid fines of $35 or $50.

Such shows of protest are nothing new on Capitol Hill. Televised hearings are open to the public, and as such, the outbursts that roiled much of the judge's testimony have become a regular feature of similar high-profile hearings. . . .

"Disrupting the hearings was a way for us to go directly into the homes of the American people to say, 'We will not be silenced and you need to be as outraged as we are,'" said Linda Sarsour, a co-chair of the Women's March and one of the organizers of this week's protests.

Leaders from the Women's March were among a broad coalition of organizations, including abortion rights groups, labor unions and

advocated for gun control, behind this week's activism.   The

---

[5] https://tinyurl.com/4w4vzvv4

Women's March partnered with the Center for Popular Democracy to help coordinate interruptions during the hearing and will assist demonstrators who are fined or arrested with legal and financial support, said Sansour.

> Sansour said she was the first person to shout out on Day 1 of the hearing.  She was one of 70 people arrested that day. That included actress Piper Perabo, known for her role on the show *Covert Affairs* on the USA Network.

*Id.*

Similar reports were published by Reuters:

Sarsour told Reuters that her group's members accounted for 209 of the 212 arrests made Tuesday through Thursday, including nearly all of the *177 arrests within the hearing room*. The majority of those arrested were charged with disorderly conduct, paid a $35 fine and released.

*Hundreds arrested in multi-day protests of Supreme Court nominee*, Reuters, 9/7/2018 at https://tinyurl.com/46tucsfn (emphasis added).

An image from the NPR article shows police removing one of the protesters from the hearing room. The protester appears to be shouting out and engaged in conduct that would appear to violate the § 231 statute –"a brief skirmish with law enforcement as they resist law enforcement as law enforcement is pushing them out" of the room:



NPR article, at 1.

Other news organizations published similar reports:

In an unusually intense episode of civil disobedience on Capitol Hill, the

four-day Senate Judiciary Committee hearing was targeted for "creative

resistance" by liberal activist groups, said Linda Sarsour, Women's

March board member.


"This is a travesty of justice! Adjourn the hearing!" Sarsour, 38, yelled on

Tuesday morning as she was the first to be taken out of the hearing room

by police officers.


Minutes later, three more women - the activists were nearly all women

- were removed as they shouted "Vote no on Kavanaugh!" and "My daughter

has the right to choose!"

*Hundreds arrested in multi-day protests of Supreme Court nominee*, Reuters,

9/7/2018  at https://tinyurl.com/46tucsfn.

None of the Kavanaugh protesters have been charged with the § 231(a)(3) felony

c i v i l   d i s o r d e r, including the 177 persons reportedly arrested within the Senate

Hearing room or the woman depicted in the photograph above.  Indeed, a search of the

ECF docket in this district shows that the three protesters identified by name in the

news articles cited above have not been charged with any federal offense.

13

### B.    Health Care Protests

In September 2017, protesters disrupted congressional hearings on health care:

The Senate Finance Committee was holding a hearing to address questions about the legislation, known as Graham-Cassidy for its architects, Republican Sens. Bill Cassidy of Louisiana and Lindsey Graham of South Carolina. Just as the Senators settled in, chants of "No cuts to Medicaid, save our liberty!" echoed throughout the hearing room.

Utah Republican Sen. Orrin Hatch, who chairs the committee, called for a brief recess until things calmed down. Still, protesters, some in wheelchairs, were carried and dragged out of the hearing room by U.S. Capitol police. Many of the protesters were affiliated with ADAPT, a grassroots' disability rights' activist group. The group shared images on social of its activists, as well as those from other groups, being arrested and carried away by officers.

*Protesters Got Dragged Out of a Hearing on the Republican Health Care Repeal Bill,* Time, 9/25/17 at  https://time.com/4956397/graham-cassidy-republican-health-care-protests.

A Washington Post reporter posted several videos of the chaotic scene on twitter.[6]



Jeff Stein
@JStein_WaPo

One officer approached an ADAPT activist to ask if she was okay being arrested.

She shouted back in officer's face: "No cuts to Medicaid!"

24.9K views     0:38 / 0:38

2:07 PM · Sep 25, 2017 from Washington, DC · Twitter for iPhone

---

[6] https://tinyurl.com/bddyxs75

Although the hearings were suspended while the protesters were taken out of the hearing room by Capitol police, their names are not known.  What is known, however, is that the United States did not charge any of these protesters with the § 231(a)(3) felony offense of civil disorder or § 1512(c)(2) felony offense for obstructing an official proceeding.[7]

In May 2009, protesters disrupted Senate Finance Committee Hearings on Healthcare. *See, e.g.,* "Protesters Disrupt Senate Hearing on Health Care" at https://www.youtube.com/watch?v=prtYKvO05A8. At the start of the hearing, dozens of protesters, holding signs, stood up in the hearing room until they were escorted out by police.  Later in the hearing starting at the 5:34 mark of the video, one after the other several protesters stood and made statements from the audience.  Once the person was escorted out by police, the next person stood up to do the same.  The disruptions caused Senator Max Baucus, Chair of the Committee, to gavel the hearing into recess several times, stating the Committee will stand in "recess until police can restore order."

     C.    ***Extinction Rebellion* Protests**

In July 2019, environmental protesters sought to prevent House members from voting on a

bill.

Protesters from the climate crisis group Extinction Rebellion have

16

brought disruption to Capitol Hill in Washington, superglueing themselves to doorways to block politicians and staff.

Just after 6pm, six activists stood in doorways to a tunnel connecting the Cannon office building to the US Capitol in an attempt to prevent members of Congress attending an evening vote.

---

[7] Other protesters were arrested in June 2017, while blocking Senator McConnell's Capitol office.  https://tinyurl.com/3wy8usf9

A total of 17 activists were arrested and charged with crowding and obstructing, according to US Capitol police. Several were also charged with defacing public property.

Demonstrators said their goal was to force a House and Senate concurrent resolution on the climate emergency – currently on hold – to receive immediate attention.

In three pairs, they used Gorilla Glue to stick their hands to the doors and each other. They were draped in yellow and red tape that said "Caution" and wore yellow hazard signs that said "Declare climate emergency" or "Closed. We're sorry. Due to the climate emergency Congress is shut down until sufficient action is taken to address the crisis."

A few members of Congress arrived and, finding their route blocked, were forced to turn around. But other people, including fellow activists, gathered under the Cannon building rotunda to watch. The demonstrators shouted, "Climate emergency now!", "We're out of time!" and "This is not a drill!"

Among the protesters, her right hand glued to an open glass door, was Sara Soko, 22, from Washington, who said she was prepared to get arrested if necessary. "I'm doing this today because the Congress is dragging their feet on declaring a climate emergency, and it's supposed to be like a speedy transition, and that's what the resolution says. So we're here to try and make this more urgent."

See The Guardian, *Extinction Rebellion protesters confront politicians at US Capitol.*[8]

A photo shows the *Extinction Rebellion* environmental protesters blocking Congressman Estes (R-KS) from trying to get to floor vote. *Id*. None of the environmental protesters were charged with a § 1512(c)(2) felony obstruction or a § 231 civil disorder offense. Moreover, a search of this Court's electronic docket shows

no federal case for Sara Soko, the protester identified in the *Guardian* article.

---

[8] https://tinyurl.com/5df9uszj

### D.     Supreme Court Protests

The government has not charged other protesters, who have intentionally disrupted

official proceedings with the § 1512(c)(2) felony.  *See, e.g, United States v. Bronstein,*

849 F.3d 1101, 1104- 05 (D.C. Cir. 2017) (internal citations omitted):

> After the Supreme Court's Marshal gaveled the Court into session and
> "audience members took their seats, ... only one member of the
> audience," Appellee Belinda Rodriguez, "remained standing."  She
> raised her arm into the air and said, "We rise to demand democracy. One
> person, one vote!" After Supreme Court police removed Appellee
> Rodriguez from the courtroom, Appellee Matthew Kresling stood up and
> said, "We rise to ... Money is not speech. One person, one vote!" Then,
> upon Kresling's removal, Appellee Yasmina Mrabet raised an arm in the
> air while saying, "Justices, is it not your duty to protect our right to self-
> government? The first ... overturn *Citizens United*. One person, one
> vote!" Upon Mrabet's restraint and removal, Appellee Richard Saffle
> stood and stated, "Justices, is it not your job to ensure free, fair elections?"
> Like his cohorts, he too was restrained and removed from the courtroom
> by police. After Saffle's disruption, Chief Justice Roberts warned the
> remaining audience members that "[a]nyone else interested in talking will
> be admonished that it's within the authority of this Court to punish such
> disturbances by criminal contempt." Nevertheless, Appellee David
> Bronstein began singing "immediately" after the Chief Justice's warning.
> Bronstein sang, "We who believe in freedom shall not rest; we who believe
> in freedom shall not rest." Bronstein, too, was removed and restrained.
> All of the Appellees were placed under arrest and subsequently
> transported to a U.S. Capitol Police station.

None of the *Bronstein* defendants were charged with the § 1512(c)(2) felony.  They were

only charged with misdemeanor offenses and sentenced to terms of probation.  *See*

*United States v. Bronstein,* Case No. 15-cr-00048-CRC (D. D.C. 2015).

### E.    Portland Oregon Riots[9]

In the summer of 2020, protestors descended on the Federal Courthouse in downtown

Portland, Oregon.  The groups gathered to protest the killing of George Floyd by police

officers in Minnesota. While the protest was less organized around a candidate than that

of January 6, one local newspaper found common threads of advocacy for "racial justice

and police accountability."[10]1  Then-

President Trump commented on the Portland protests on Twitter:  "The FBI and Law

Enforcement must focus their energy on ANTIFA and the Radical Left, those who

have spent the summer trying to burn down poorly run Democrat Cities throughout

the USA!"[11]

According to the government, the protests in Portland:

Were followed by nightly criminal activity in the form of vandalism,
destruction of property, looting, arson, and assault.  One violent event
impacting federal property occurred on May 28, 2020, when the Portland
Field Office for the Immigration and Customs Enforcement (ICE) was
targeted by a Molotov cocktail.  The Mark O Hatfield Courthouse has
experienced significant damage to the façade, glass, and building fixtures
during the weeks following this incident.  Additionally, mounted
building security cameras and access control devices have been
vandalized or stolen. The most recent repair estimate for the damage at
the Mark O. Hatfield Courthouse is in excess of $50,000. Other federal
properties in the area routinely being vandalized include the historic
Pioneer Federal Courthouse, the Gus

_____

[9] The materials in this section are derived, with limited edits, from the pleadings filed

by the
Office of the Federal Public Defender for the Eastern District of Virginia in *United States v. Judd*, No. 21-cr-00040-TNM.

[10] Ding, Jaimie, *Portland Protests: Who turned out night after night?,* The Oregonian (May
30, 2021), available at: https://www.oregonlive.com/news/2021/05/who-protested-night-after-night- inportland.html.

[11] *Here are President Trump's 5 Tweets about Portland Today,* The Oregonian (Oct. 12,
2020), available at: https://www.oregonlive.com/politics/2020/10/here-arepresident-trumps-5-tweets- about-portland-today.html.

Solomon Courthouse, and the Edith Green Wendall Wyatt Federal Office Building. FPS law enforcement officers, U.S. Marshal Service Deputies and other federal law enforcement officers working in the protection of the Mark O. Hatfield Courthouse have been subjected to assault, threats, aerial fireworks including mortars, high intensity lasers targeting officer's eyes, thrown rocks, bottles and balloons filled with paint, and vulgar language from demonstrators while performing their duties.

*United States v. Bouchard,* No. 3:20-mj-00165 (D. Ore. July 24, 2020), ECF 1-1 at 4-5.

One example of such damage occurred on July 24, 2020, when "protestors attempted to breach into the Mark O. Hatfield Federal United States Courthouse (USCH) by damaging and removing the protective fencing around the west entrances of the USCH." *Id.* at 5. The marshals and

U.S. Customs and Border Protection (CBP) deployed tactical teams to defend the breach. *Id.* After repeatedly defying verbal commands to move back, one defendant "placed his right arm around the neck of CBP officer 1 in headlock maneuver." *Id.* at 6. When another officer came to "remove [defendant's] right arm from around the neck of Officer 1... all three individuals went to the ground." *Id.* At the time, the defendant "was carrying a leaf blower and a shield." *Id.* In contrast to Ms. Bauer, the defendant was only charged with a misdemeanor, which the government eventually moved to dismiss without prejudice. *Id.* (ECF 16).

Another defendant "used a homemade shield to strike the officer in the face." *United States*

*v. Johnson,* No. 3:20-mj-00170 (D. Ore. July 27, 2020) (ECF 1 at 5). A search of the suspect revealed an "extendable baton, OC spray, steel plated body armor, helmet, individual first aid kid, shin guards, gas mask, goggles…" *Id.* at 6.  This defendant was also only charged with a misdemeanor, which the government subsequently moved to dismiss. Id.  (ECF 9).

A third defendant "struck DUSM VICTIM 1 in the face with a shield and then punched DUSM Victim 1 in the face with a closed fist." *United States v. Webb*, No. 3:20-mj-00169 (D. Ore. July 27, 2021) (ECF 1 at 5).  The defendant "resisted arrest by pulling his arms away from the DUSMs in an attempt to avoid being restrained." *Id.* at 5-6. This defendant was also charged with only a misdemeanor, which the government subsequently moved to dismiss. *Id.* (ECF 22).

After a review of the evidence, the government charged at least twenty-two individuals in Portland with assaulting an officer, in violation of 18 U.S.C. 111(a).  Of those identified, at least 25 cases were dismissed, including one in which the defendant carried a knapsack with 14 commercial- grade fireworks. Of those cases, at least six cases were dismissed with prejudice through a deferred resolution agreement. In other cases involving alleged acts of violence, the government agreed to recommend probation. These dismissals and resolutions have occurred under the same Department of Justice that continues to prosecute Mr. Groseclose for his non-violent conduct with a 20-year felony.

### F.   *Lafayette Park Protests*

The Lafayette Park protests, inflamed by George Floyd's death, raged on for four days steps from the White House between May 29 and Jun. 1, 2020.  According to a June 2 statement from.   United States Park Police (USPP) acting Chief Gregory T.

Monahan, the Lafayette protests devolved into daily riots where individuals damaged property and injured many law enforcement officers. Monahan states, *"During four days of demonstrations, 51 members of the USPP were injured; of those, 11 were transported to the hospital and released, and three were admitted...protestors became more combative, continued to throw projectiles, and attempted to grab officers' weapons..."*

https://www.nps.gov/subjects/uspp/6_2_20_statement_from_acting_chief_monahan.htm

Rather than continued criminal prosecutions years later, as in the January 6 protests, our government settled with Lafayette Park rioters and demanded DC law enforcement amend its procedures in response to those protests.

**https://storage.courtlistener.com/recap/gov.uscourts.dcd.218706/gov.uscourts.dcd.218706.182.1_1.pdf**

**https://www.nps.gov/aboutus/foia/upload/GO-2301-Demonstrations-and-Special-Events.pdf?utm_medium=email&utm_source=govdelivery**

### III.    The Law

To make out a selective enforcement claim, the target of enforcement must displace "the presumption that a prosecutor has acted lawfully." This

requires a plaintiff to demonstrate he was singled out for enforcement "from among others similarly situated."

Individuals "are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." The "similarly situated requirement is necessary" to ensure courts are not " 'interfer[ing] with the course of criminal justice.' "

The similarly situated requirement strikes the proper balance between executive discretion and judicial enforcement of constitutional rights by isolating whether a decision turns on "unlawful favoritism," rather than lawful prosecutorial considerations. In practice, courts must assess whether a plaintiff is similarly situated to a person against whom the law was not enforced across the relevant prosecutorial factors. Such factors may include "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan.

*Frederick Douglass Found., Inc. v. D.C.*, at *5 (internal citations omitted).

IV.   **Application to the Instant Case**

It is clear from a review of the examples cited above, that the United States has selectively enforced the § 231 offenses against Braun.  At a minimum, the Court should require the Government to explain why it has targeted Braun with felony charges while allowing thousands of other demonstrators to face non-felony charges.

**DISCOVERY**

In addition, if the Court is not persuaded that Braun has made out a prima facie case of selective prosecution, he respectively moves the Court to order the United States to provide the appropriate and relevant discovery including:

(1) a list of all cases from the last three years in which the Government arrested persons on the grounds and within the United States Capitol for a potential violation of any of the offenses charged in the instant case;

(2) identify the subject matter of the protests or other activity carried out by the persons in response to (1) above,

(3) identify which law enforcement agencies were involved in the investigations of those cases; and

(4) explain its criteria for deciding to prosecute those defendants in this Court, Superior Court, or not to prosecute altogether.

## CONCLUSION

WHEREFORE, Braun respectfully requests that this Honorable Court dismiss his

case for selective enforcement or compel the Government to produce the relevant

discovery related to its prosecutorial decisions.

Respectfully submitted,

GEORGE T. PALLAS, P.A
Counsel for Jerry Braun
2420 SW 22nd Street
Miami, FL 33145
305-856-8580
305-860-4828 FAX
george@pallaslaw.com

By:/s/_____*George T. Pallas*_____
          GEORGE T. PALLAS, ESQ.

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the

Court using CM/ECF system which will send notification of such filing.

By:/s/_____*George T. Pallas*_____
          GEORGE T. PALLAS, ESQ.